**UNITED STATES of America**

**v.**

**Elizabeth Roxanne GREWAL.**

**UNITED STATES of America**

**v.**

**David J. VASILE.**

**Criminal Nos. 96–751, 97–305.**

United States District Court,
D. New Jersey.

April 14, 1998.

Faith S. Hochberg, United States Attorney, Kevin T. Smith, Assistant United States Attorney, Camden, NJ, for U.S.

Richard Coughlin, Federal Public Defender, Anne E. Blanchard, Assistant Federal Public Defender, Camden, NJ, for Elizabeth Roxanne Grewal.

John C. Eastlack, Jr., Poplar & Eastlack, P.A. Turnersville, NJ, for David J. Vasile.

## OPINION

ORLOFSKY, District Judge.

These cases emerge from a bizarre saga of extortion, murder, international assassins and southern New Jersey diners. In these surreal circumstances, casual encounters between the two defendants evolved into a clumsy scheme to extort $100,000 from a local businessman whose partner was the victim of an unsolved murder. The defendants' nocturnal meetings rapidly escalated to letters and telephone calls to the victim, demanding money in exchange for silence

about the team of assassins which the victim allegedly flew in from India to murder his business partner. An FBI sting snared David J. Vasile, a retired police officer, and Elizabeth Roxanne Grewal, a woman he knew from the local diners.

Grewal pled guilty to count three of a three-count indictment, charging her with sending extortionate threats through the mails. Vasile pled guilty to a one-count information charging him with conspiracy to receive the proceeds of extortion. Grewal has moved for a downward departure based on the avoidance of perceived greater harms pursuant to U.S.S.G. § 5K2.11, contending that the victim of this extortion plot had murdered his business partner and that her actions were designed to bring this wrongdoer to justice. The government has moved for a downward departure on Vasile's behalf pursuant to U.S.S.G. § 5K1.1, based on his substantial assistance to the government. An evidentiary hearing exposed a tangled web which included revelations of perjury and destruction of evidence. For the reasons set forth below, both of these motions will be denied. In addition, I find that Vasile is not entitled to downward adjustments in his offense level for acceptance of responsibility or his role in the offense.

## I. BACKGROUND

On February 13, 1998, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, I convened an evidentiary hearing to resolve the dramatic discrepancies between the two defendants' versions of the operative facts. The hearing consumed that day and was continued on March 6, 1998. At the conclusion of the sentencing hearing, I notified counsel that I was considering *sua sponte* upward departures under U.S.S.G. § 3C1.1 for obstruction of justice with regard to both defendants, and I invited counsel to submit briefs on that issue. *See* Letter from the Court to Counsel (dated March 9, 1998) (citing Fed.R.Crim.P. 32 and *Burns v. United States,* 501 U.S. 129, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991)).

Based upon the sworn testimony and demonstrative evidence presented at the evidentiary hearing, *see* U.S.S.G. § 6A1.3, as supplemented by the Presentence Investigation Reports and the plea agreements, *see*

U.S.S.G. § 6B1.4(d), I have developed a sufficient factual record to impose sentence. *See* Fed.R.Crim.P. 32(c)(1) ("For each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing.").

### A. The Extortion According to Grewal

According to Grewal, she was working as a waitress at a diner in Glassboro, New Jersey, when she met Vasile. *See* Transcript of Sentencing Hearing (dated February 13, 1998, and March 6, 1998) ("Tr.") at 144. Grewal testified that they met 20 years ago, but that she has seen Vasile "on a regular basis" since then, including frequent meetings in diners and "numerous" trips by Vasile to Grewal's home. *Id.* at 144–45, 148. Although Vasile agrees that he and Grewal had been acquainted years before, Vasile contends that he had not been in contact with Grewal for approximately 15 years prior to September of 1996. *Id.* at 4–5, 9–10. I need not tarry here to describe the extensive testimony addressing the nature and frequency of the contacts between Vasile and Grewal prior to the events of the present extortion scheme, *see, e.g., id.* at 236–38 (testimony of Grewal's daughter); *id.* at 205–209 (testimony of Grewal's cousin), because this debate is not relevant to the sentencing issues pending before the Court. *See* Fed.R.Crim.P. 32(c)(1).

#### 1. Tandoori, Murder and Grewalian Justice

In 1991, Grewal married a man of Indian descent and was introduced to the local Indian community. Tr. at 149. In 1991 or 1992, Grewal met Alamjit Gill and Parmajit Singh, who were partners in a gas station business. *Id.* at 149–50. Grewal, her husband, Gill and Singh belonged to a social circle which frequented a popular Tandoori restaurant owned by Sonny Kelsey. *Id.* at 150–51; *see id.* at 55 (Grewal and her friends "were always there").

One day in April of 1992, Grewal observed Gill talking to Kelsey who later repeated that conversation to her. Gill reportedly told Kelsey that Singh "was becoming a problem"

and that Gill wanted to spend time with Singh's wife but Singh was "always in the picture." *Id.* at 152. According to Kelsey, Gill also said that he no longer wanted Singh as a business partner and that Singh's wife "would get a large insurance settlement" if Singh "was out of the picture." *Id.*

Although Kelsey said that Gill probably had not meant it, Kelsey also told Grewal that Gill had "said it in a serious tone." *Id.* at 153. Grewal testified that she was "disturbed" by that conversation because she "just didn't like the tone of the ... the way that he had said it because I knew people in the Indian community were saying that Mr. Gill was having an affair with [Singh's wife]." *Id.* Grewal concluded that "this sounded as though [Gill] wanted [Singh] out of the picture." *Id.* Two weeks later, Singh was murdered. *Id.* at 153–54; *see* Presentence Investigation Report for Elizabeth Roxanne Grewal ("Grewal PSI") at ¶ 24.

According to Grewal, people in the Indian community "suspected that Mr. Gill had had [Singh] murdered, that he had brought people in from India, had him killed, and then put them back on a plane and sent them back to India, that is why there were no suspects to be found." Tr. at 157. Even prior to Singh's death, however, Grewal had "despised" Gill's lifestyle because he allegedly cheated on his wife with prostitutes and with a waitress at Kelsey's restaurant. *Id.* at 158. Grewal's disapproval of Gill became an "obsession" and she ultimately concluded that Gill was responsible for Singh's murder. *Id.* at 158–60 ("I absolutely believed that yes, he was the one who planned it and carried it out."); *see also id.* at 263 (testimony by an FBI agent that the Camden County Prosecutor's Office reportedly considered Gill's father a suspect in Singh's murder).

Nevertheless, Grewal never went to the police with the information in her possession because she feared that she lacked sufficient evidence. *Id.* at 159, 200; *see also id.* at 157 (Grewal testified that other members of the community refused to talk to the authorities because Gill threatened to have their families in India killed). As Grewal explained: "It's not possible for the authorities here to find individuals who committed this murder when these individuals are in India. They're not going to send people to India to try and look

for this, and that is exactly what I believe took place." *Id.* at 200.

Instead, Grewal testified that she decided to keep this information to herself and to "get more information against Mr. Gill to take to the authorities." *Id.* at 160. She spent the next four years collecting rumors and other sordid information about Gill, but amassed only embarrassing information rather than evidence of criminal conduct. *Id.* at 160–61. Thus, Grewal turned to Vasile, whom she knew to be a former police officer, for assistance.

## 2. Recipe for Extortion

Grewal testified that she saw Vasile at the Liberty Diner in late November or December of 1995 and that, after telling her story, she asked Vasile "how I could use the information that I have to make Mr. Gill come forward and be found guilty of this murder." Tr. at 162–63. Grewal claims that Vasile agreed to use his police contacts to attempt to gather additional information about Singh's murder. *Id.* at 163–64.

According to Grewal, Vasile told her that "the only way that you are going to get this guy to come forward is you've got to intimidate him, give him the impression that you're watching every move that he makes, make him feel scared ... and then you might have something, then maybe you could get him to come out." *Id.* at 166; *see also id.* at 167–68. Thus, according to Grewal, Vasile suggested that she send Gill a letter and that she send it from a large corporation in order to make Gill pay attention. *Id.* at 168. Vasile offered to "collaborate" with Grewal on compiling the facts to set forth in this letter. *Id.* at 171. Vasile then accompanied Grewal to her home where the pair discussed the details of the letter, including the use of a post office box in another state. *Id.* at 172.

In early August of 1996, Grewal contacted her daughter Symphony Roxanne Gaffney in Maryland and instructed her to obtain a post office box in the name of the Diva Corporation. *Id.; see id.* at 244–45. Gaffney complied, reportedly without asking or being told why. *Id.* at 245–46. Thereafter, Grewal sent three sealed packages to Gaffney, which Gaffney in turn mailed to Gill. *Id.* at 245,

279–80. Throughout these transactions, however, Gaffney acknowledged that she had no contact with Vasile. *Id.* at 245–46.

Grewal also asked Gaffney whether Gaffney's boyfriend, William Lucich, had a checking account. *Id.* at 248, 302, 310. Grewal testified that she asked about Lucich's checking account because she was selling her house and closing her own bank account, and wanted to deposit the money from the sale of her home in Lucich's account. *Id.* at 303. One of the demand letters received by Gill, however, directed him to send $50,000 in the form of a cashier's check made payable to William Lucich. See Ex. G–1; *see also* Tr. at 310–11.

Grewal testified that Vasile also suggested the idea of placing telephone calls to Gill. Vasile suggested that Grewal telephone Gill, pretending to represent a large corporation which had been surveilling Gill on behalf of an interested client. *Id.* at 173; *see also id.* at 175–76 (Grewal testified that Vasile offered to get her a device to disguise her voice). According to Grewal, Vasile then "gave me the basis of, you know, what he wanted me to say." *Id.* Although Vasile did not "push" this idea on Grewal, she agreed because she was "obsessed with the fact that I wanted Mr. Gill brought to justice" and because she was confident in Vasile's knowledge and experience as a police officer. *Id.* at 173–74.

Grewal further testified that it was Vasile's idea to demand money because Gill's payment would evidence his guilt. *Id.* at 174. Grewal testified that it was also Vasile who suggested the sum of $50,000. *Id.* Nevertheless, despite some initial misgivings, Grewal decided to "go a long [sic] with" this plan even though she did "know it was against the law to do so." *Id.* at 174–75. Grewal also testified that she had never spoken to Vasile about Vasile taking any money: "He never asked me for money and I never volunteered money." *Id.* at 194.

### 3. Denny's and the Ingredients of a Plan

On November 4, 1996, Vasile left a message for Grewal to telephone him, but they did not make contact until the next day. Tr. at 177–78. The following morning, Grewal returned his call and arranged to meet Vasile at the 99 Cent Store at the Deptford Mall. *Id.* at 178. When Grewal arrived at that location, however, Vasile was not there. *Id.* Grewal then called Vasile at Sears from a pay phone and had him paged. *Id.*

When Vasile arrived at the 99 Cent Store, he told Grewal that he was tied up with an emergency at work but that he would meet her at Denny's restaurant in Washington Township at midnight, and that they would then determine the location of Gill's home. *Id.* at 179–81. Vasile also advised Grewal that he wanted to arrange the money-drop at Sears where he worked as a security manager and could monitor the events. *Id.* at 181.

Grewal testified that, since she was going to be there anyway, she arranged for her husband to meet her at Denny's, because he was hungry, and also for Jackie Allen, a waitress from the diner, to meet her at Denny's to collect some Avon products which Allen had purchased through Grewal. *Id.* at 181–82. Grewal's husband came and went without incident, *id.* at 183–84, and Vasile left to place a telephone call while Grewal and Allen discussed Avon products, *id.* at 184. When Vasile returned to the Denny's parking lot, he told Grewal that they needed a car for the drop other than his or hers. *Id.* at 184–85. Grewal then asked Allen if they could use her car. *Id.* at 185. During his absence from the parking lot, Vasile had reportedly called the Voorhees police department and obtained Gill's address by identifying himself as an officer working on a case. *Id.* at 186. Vasile then drove Grewal to Gill's address where they observed Gill's car. *Id.* at 186–87.

### 4. Donuts and Late Night Telephone Calls

After the reconnaissance mission to Gill's home, Grewal and Vasile proceeded to a Dunkin' Donuts restaurant from which three telephone calls were placed. Vasile placed the first call to Gill but, after some banter, Gill hung up on Vasile. Tr. at 188. During a subsequent call, Vasile heard "clicks" on the telephone line and grew suspicious that the call was being recorded. *Id.* at 189. Presumably reasoning that the call was being recorded from the pay phone at Dunkin'

Donuts rather than from the victim's home, Vasile switched phones to a pay phone at a 7–Eleven convenience store. *Id.*

At the 7–Eleven, Vasile coached Grewal not to talk for long. *Id.* This included writing "Don't Talk Long" on an envelope while Grewal spoke to Gill. *Id.* at 189–90; *see* Ex. DG–2. While Grewal spoke to Gill, Vasile jotted the model of the drop car on the envelope for Grewal to relay to Gill and also asked Grewal whether she heard clicks on the line. Tr. at 190. In response, after hanging up the telephone, Grewal asked Vasile: "what difference does it make? I thought you had—you were taking care of this." *Id.*

Before leaving Grewal that evening, Vasile drew a diagram of the Sears parking lot for her so that she could tell Allen exactly where to park her car. *Id.* at 191; *see* Ex. DG–2. Vasile emphasized the importance of the exact location because he could monitor it with the security cameras in his office. Tr. at 191.

### 5. Out of the Frying Pan and into the Fire

The next morning, November 6, 1996, Grewal instructed Allen to park her car in the spot selected by Vasile and then to wait for Vasile in the Friendly's restaurant located in the mall. Tr. at 193. Grewal, whose presence at the mall had never been contemplated by the plan, then called Vasile "a couple [of] times" to inform him that Allen was on her way. *Id.* at 194.

At approximately 11:00 a.m., Grewal received a telephone call at home from Vasile informing her that federal agents were present at the Deptford Mall. *Id.* at 195–96. Grewal allegedly told Vasile to tell the truth if questioned by the agents. *Id.* Vasile replied: "yeah, that will work, but let me check things out." *Id.* This conversation alarmed and confused Grewal who consequently gathered "bits and pieces that were added to the extortion letter," placed them in a kitchen pot on top of her stove, *see* Ex. G–2, and set them ablaze. Tr. at 197–98.

Grewal testified that she burned these documents because Vasile had frightened her by his reaction to the presence of federal agents: "If he supposedly was doing what he was supposed to, why would he worry if

there were federal agents there?" *Id.* at 197. Thus, Grewal set fire to this evidence because she "didn't want anything linked back to [her] if it wasn't going to be right." *Id.* at 198; *see id.* at 199 (Grewal agreed with the Court's statement that "the bottom line is you didn't want anyone, including the police or the FBI, to find you with this evidence in your possession"). That afternoon, federal agents arrested Grewal at her home.

### B. Vasile's Version

In October of 1995, Vasile retired as a lieutenant of the Glassboro Police Department after approximately 30 years of service. *See* Presentence Investigation Report for David J. Vasile ("Vasile PSI") at ¶ 57 *and* Tr. at 57. From that time until November of 1996, Vasile was employed by Sears as a security manager at its store in the Deptford Mall. *See id.* at ¶ 56. During several chance encounters at diners across southern New Jersey, Vasile became reacquainted with Grewal in September of 1996. *See supra* Part I.A.

On several occasions, they spoke concerning a limousine business which was owned by several retired police officers from Washington Township. *Id.* at 9–10. Thereafter, Grewal telephoned him at Sears several times to discuss the use of that limousine service in connection with a plan to obtain immigration documents and to bring an alien into the country. *Id.* at 13–14.

### 1. Restaurant Reconnaissance

Grewal approached Vasile one night in a diner parking lot and asked Vasile to "take a ride with her." Tr. at 15. Although Vasile "was really tired that night" and "wanted to go home and go to bed," he drove Grewal approximately 20 miles to the Diamond Diner in Cherry Hill. *Id.* at 16. Vasile explained that Grewal "had to see somebody and she didn't want to go up by herself" and that he agreed because he "had nothing to do." *Id.* at 73.

After they found a table and ordered drinks, Grewal excused herself for approximately 15 minutes. *Id.* When she returned, they left and drove the 20 miles back to the diner. *Id.* The former police lieutenant fur-

ther testified that, although he was curious, he never asked Grewal a single question about where she had gone when she left the table or what she had done. *Id.*

On November 5, 1997, Grewal again telephoned Vasile at work and asked him to meet her at Denny's restaurant because Grewal wanted to check out the address of the victim of the illegal immigration scheme. *Id.* at 17, 82. Vasile described a brief encounter in the parking lot at Denny's where he met Grewal's husband who told Vasile that the immigration scheme was Grewal's "show." *Id.* at 18; *see id.* at 85. Vasile then drove Grewal to a parking lot near the Echelon Mall in order to determine whether a particular car was parked in that lot. *Id.* at 18–19. Vasile testified that he went with Grewal because she had tried to find the address before but failed. *Id.* at 19.

### 2. Telephone Calls

After Grewal found the car she sought, she and Vasile proceeded to a Dunkin' Donuts restaurant where Grewal placed a telephone call. Tr. at 14. At that time, Vasile believed that Grewal was planning to take money from a man on the pretext that Grewal would arrange to get his wife into the United States. *Id.* at 20. Moreover, at that time Vasile was not to share in Grewal's proceeds. *Id.; see also id.* at 20–21. Although Vasile, a 30–year veteran of the police force, did find this "a little bit strange," he continued to participate in the conspiracy for no reason he could articulate. *Id.* at 20.

At some unclear point in time, Vasile recognized that the immigration scheme was actually an extortion plot. *See infra* Part II.F. The duo proceeded to place a series of telephone calls to Gill instructing him to leave the money in a car in the Sears parking lot at the Deptford Mall. *See id.* at 21–23. According to Vasile, it was definitely Grewal who placed the first telephone call to Gill in order to determine whether he was at home. *Id.* at 21, 38. During one of these conversations with Gill, Vasile learned that the amount of money at stake was $50,000. *Id.* at 22–23, 29.

Vasile testified that he only spoke to Gill to relay information from Grewal because Grewal thought it would sound better coming from a man. *Id.* at 38–39. When Gill protested, however, Vasile, on his own initiative, said to Gill: "Well then we will take other measures." Ex. G–4a (tape recording of telephone call); *accord* Ex. DG–4 at 2 (transcript of recorded telephone call); *see* Tr. at 39. Grewal then placed another call, but Vasile was only present at its inception. *Id.* at 23. On their way back to Grewal's car, which had been left at the Denny's parking lot, Grewal placed yet another call from a telephone at Dunkin' Donuts but Vasile did not know whom she called. *Id.* Vasile then drove Grewal to her car and did not see her again until the following day. *Id.*

### 3. The Plot Sours

Early on the morning of November 6, 1996, Vasile discussed this plot with his co-workers at Sears and "told them I thought it was an extortion." Tr. at 27, 31, 32. Later that morning, Grewal telephoned Vasile at work and offered him $2,500 to "pick up the package." *Id.* at 23–26. Although he realized he was involved in an extortion plot, Vasile agreed and proceeded with the plan with the expectation that he would receive $2,500 from the proceeds of the extortion. *Id.*

Jackie Allen, the diner waitress, then retrieved the drop car and drove it to an area of the mall where Vasile waited to receive the money. *Id.* at 25. After retrieving the package in his own truck and driving back to Sears, Vasile opened it and discovered that it contained only paper. *Id.* At that point, law enforcement agents descended on Vasile and placed him under arrest. *Id.* at 25–26.

### C. The Plea Agreements

On April 15, 1997, Vasile entered into a plea agreement with the government by which the government agreed to refrain from further prosecution in exchange for his agreement to plead guilty to conspiracy in violation of 18 U.S.C. § 371.[1] *See* Plea

---

**1.** That statute provides: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 371.

Agreement with David J. Vasile ("Vasile Plea Agr.") at 1. Vasile also agreed to "cooperate fully" with the government and to "truthfully disclose all information concerning all matters" about which the government inquired. *See id.* at 2. The plea agreement also included several stipulations between the parties, but explicitly recognized that the Court might refuse to accept any or all of those stipulations. *See id.* at 4; *see also* U.S.S.G. § 6B1.4(d). On June 6, 1997, Vasile pled guilty to a one-count information charging that he violated 18 U.S.C. § 880[2] by, between the approximate dates of October 20, 1996, and November 6, 1996, conspiring to receive and possess money obtained by extortion. *See* Vasile PSI at ¶ 1; *see also* Vasile Information at 1.

Subsequently, Grewal entered into a plea agreement with the government whereby she agreed to plead guilty to violating 18 U.S.C. § 876 as a principal in exchange for the government's agreement to refrain from bringing further charges against her for her conduct in that offense.[3] *See* Plea Agreement with Elizabeth Roxanne Grewal ("Grewal Plea Agr.") at 1. Grewal's plea agreement also contained certain stipulations, along with the explicit caveat that I need not accept any of those stipulations at sentencing. *See id.* at 2; *see also* U.S.S.G. § 6B1.4(d).

On July 25, 1997, Grewal pled guilty to count three of a three-count indictment charging that, on or about September 25, 1996, Grewal "knowingly, wilfully and with the intent to extort money from Alamjit Gill, cause[d] to be delivered by the Postal Service a communication ... which communication contained a threat to injure the reputation of Alamjit Gill" in violation of 18 U.S.C. §§ 876, 2. *See* Grewal PSI at ¶¶ 1, 4; *see also* Grewal Indictment at 3.

## II. NECESSARY FINDINGS

"For each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing." Fed.R.Crim.P. 32(c)(1). This task is particularly difficult in the present case, both because the stories told by each defendant are so different that it is difficult to identify specific issues of contention, and because so little of the testimony I have heard from either defendant is credible. Moreover, Vasile's testimony was as muddled and confusing as he could possibly make it.

Fortunately, most of the discrepancies between the two defendants' accounts of the operative facts do not affect my sentencing decisions and need not be addressed here. *Compare* Tr. at 178–81 (Grewal testified to an inconsequential meeting with Vasile at the 99 Cent Store in the Deptford Mall) *with* Tr. at 79–80 (Vasile testified that he never met Grewal at the 99 Cent Store); *compare also* Tr. at 144–45 (Grewal testified that she met Vasile 20 years ago while working at a diner and has seen him "on a regular basis" ever since) *with* Tr. at 4–5 (Vasile testified that he met Grewal approximately 20 years ago but did not see her for 15–18 years until September of 1996); *compare also* Tr. at 188 (Grewal testified that Vasile placed the first telephone call to Gill) *with* Tr. at 38 (Vasile testified that Grewal placed the first telephone call to Gill). I will not linger here to settle defendants' petty squabbles concerning such collateral and immaterial facts.

I will, however, make such findings as are necessary to illustrate both defendants' general lack of credibility. I also make findings which specifically support the disposition of the pending motions.

---

**2.** That statute provides: "A person who receives, possesses, conceals, or disposes of any money or other property which was obtained from the commission of any offense under this chapter [extortion and threats] that is punishable by imprisonment for more than 1 year, knowing the same to have been unlawfully obtained, shall be imprisoned not more than 3 years, fined under this title, or both." 18 U.S.C. § 880.

**3.** That statute provides in relevant part: "Whoever, with intent to extort from any person any money or other thing of value, knowingly so deposits or causes to be delivered, as aforesaid, any communication, with or without a name or designating mark subscribed thereto, addressed to any other person and containing any threat to injure the property or reputation of the addressee or of another, or the reputation of a deceased person, or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both." 18 U.S.C. § 876.

## A. The Motor Vehicle Abstract

Grewal testified that one night toward the end of July, 1996, Vasile found her at the Liberty Diner and gave her a "motor vehicle abstract," Ex. DG–3, reflecting Gill's driving history and some personal information. Tr. at 168. Grewal provided a detailed description of this transaction:

he [Vasile] brought me this abstract in the Liberty Diner in full view of the other customers, regular customers. In fact, they were laughing because he was going over the abstract saying this guy's a real clown, you know, look at all these points, look at all this driving, the history he has.

*Id.* at 170; *see id.* at 317–19. Grewal stuck to this story even when given the opportunity to reconsider her testimony. *See id.* at 322.

William Pluta, however, the godfather of one of Grewal's daughters, is employed by the New Jersey Department of Motor Vehicles. *Id.* at 321–22, 326–27. At the evidentiary hearing, Pluta identified the abstract and admitted that he printed it from his computer terminal. *Id.* at 327. Moreover, he testified that the computer terminal number appearing on the abstract positively identified the document as having been printed from his terminal. *Id.* Pluta further testified that he printed the abstract at Grewal's request and that Grewal subsequently asked him for additional information which he did not provide. *Id.* at 327–28. Pluta candidly acknowledged that it was illegal for him to print this abstract for Grewal. *Id.* at 331. Finally, Pluta confirmed that he had never had any contact with Vasile concerning this abstract, and had likely never even met Vasile. *Id.* at 329–30.

Thus, Pluta testified against his own goddaughter's mother and against his own interest. Given these indicia of reliability and the circumstances of the transaction, as well as Pluta's credible demeanor, I do not hesitate to find that Pluta printed the abstract at Grewal's request and that Vasile played no role in obtaining the abstract. Consequently, I find that Grewal's self-serving testimony explaining the manner in which she received the abstract was a lie.

## B. The Daughter's Boyfriend's Bank Account

Grewal admitted inquiring about Lucich's bank account. Tr. at 248, 302, 310. Coincidentally, one of the extortionate letters received by Gill from Diva Corporation happened to instruct Gill to send a cashier's check payable to Lucich. *See* Ex. G–1; *see also* Tr. at 310–11. Grewal denied that she had planned to deposit Gill's money in Lucich's account, and testified that she was going to sell her house and close her own bank account, and merely wanted to deposit the proceeds of the sale into Lucich's account until she used them to pay for a new house. *Id.* at 303. When asked why Gaffney, Grewal's daughter, would have been so upset when the FBI questioned her, Grewal explained that Gaffney was probably not upset but merely "inconvenienced, it may have disrupted her day" to be questioned by federal agents about her mother's suspected extortion plot and her own involvement in it. *Id.* at 303. I do not credit Grewal's explanation for the connection between herself, Lucich and the demand letter. Rather, I find that Grewal did in fact intend to deposit the $50,000 she hoped to receive from Gill into Lucich's account.

## C. The Mystery Typist

Grewal testified that, on the day of the arrests, she began to fear prosecution because Vasile appeared to be alarmed by the presence of federal agents at the location of the drop. *See* Tr. at 197–99. Nevertheless, according to Grewal, when Vasile sat typing the demand letters in her home wearing gloves because his "fingerprints can't appear on these," Grewal never suspected that this scheme was illegal. *See, e.g.,* Tr. at 301. Based on the evidence presented and on my evaluation of Grewal's credibility at the hearing, I do not credit Grewal's testimony that Vasile typed the letters and find that Grewal herself typed the extortion letters.

## D. Show Me the Money

At the time of his arrest, Vasile told agents of the Federal Bureau of Investigation "that he was not going to get anything out of [the scheme]." Ex. DG–1, Atch. B at ¶ 5; *accord*

Tr. at 55; *see id.* at 62 (Vasile testified that he "may have" told the FBI that he was not to receive any money). On cross-examination, however, Vasile testified:

Q. When you were arrested by the FBI, you told the FBI that—you told them about your involvement with the phone calls and all that. Then you said you weren't going to get anything out of this; is that correct?

A. Right.

Q. And you were telling the truth when you said that, right?

A. I felt that I wasn't going to take any money, that wasn't my, my purpose at that time.

Q. What was your purpose at that time?

A. [Short pause] I guess to take the money.

Tr. at 55. Vasile corroborated this admission by testifying that, on the morning of November 6, 1998, he agreed to accept $2,500 from Grewal for retrieving Gill's payment. *Id.* at 26.

I am led inexorably to three conclusions: (1) Vasile intended to receive payment in exchange for his services in this plot; (2) Vasile lied to the FBI when he told them that he was not expecting to receive any payment in connection with this scheme; and (3) Vasile lied at the sentencing hearing when he first testified that his purpose was not to "take the money."

### E. Knowledge of Letters

Vasile testified under oath that he had no knowledge of the letters which were sent to Gill until after his arrest. Tr. at 28. During one of Vasile's recorded telephone conversations with Gill, however, Gill said to Vasile: "I have received your letter [sic] in your letter you said you will meet me during the daytime in a public place." Ex. DG–4 at 2; *see* Ex. G–4a. Vasile responded that "there was nothing ... said about daytime." *Id.* Thus, I find that Vasile knew of these letters *at least* as of the time these telephone calls were placed in the early morning of November 6, 1996.

### F. Memories of Extortion

Vasile testified that, as of the time of the telephone calls early on the morning of No-

vember 6, 1996, he knew nothing of an extortion plan. Tr. at 41. The PSI reflects inconsistent information in this regard. *Compare* Vasile PSI at ¶ 17 (in early November of 1996, "Grewal told Vasile that she had information on Gill and was going to blackmail him") *with id.* at ¶ 17 n. 1 ("In his post-arrest statement to the FBI, Vasile indicated that it was only after these telephone calls were made that he realized that Grewal was attempting to extort money from the man they had spoken to."). This issue spawned voluminous testimony at the evidentiary hearing which must be described to be believed.

During his cross-examination by Grewal's counsel regarding his knowledge at the time of the telephone calls, Vasile testified unequivocally:

Q. But you're not part of any extortion plan—

A. No.

Q.—at this point? You know nothing about an extortion plan at this point?

A. No.

Tr. at 41. Moments later, however, during a colloquy with the Court, Vasile testified:

Q. So, at that time that that phone call was made, which was early in the morning of November 6th, is it your testimony that you did not know that there was an extortionate scheme to extort money from Mr. Gill going on?

A. Oh, I believed it at that point.

Q. You knew it when you were making the phone calls that night?

A. Yeah, I believed it.

*Id.* at 42. Vasile attempted to clarify this by explaining that he only learned of the extortionate nature of Grewal's plan within the 24 hours preceding his arrest on November 6. *Id.* at 42–43.

Grewal's counsel then asked Vasile whether he "knew about the fact that Roxanne was trying to blackmail someone and actually was extorting money ... [p]rior to the phone calls." *Id.* at 45. Vasile answered "Yes." *Id.* Counsel reiterated: "You knew this was an extortion scheme?" and Vasile replied: "Yes, yes. Yeah, I felt that." *Id.* Once again,

Vasile attempted to explain these testimonial discrepancies, stating that he had suspected it was extortion but the telephone calls were "like the straw that broke the camel's back." *Id.* at 46.

Vasile then further confused this issue by admitting that "[b]efore those phone calls, [he] knew there was an extortion attempt." *Id.* at 47. As the cross-examination continued, Vasile testified:

Q. Were you telling the truth when you told the FBI that it wasn't until after the phone calls that you figured out Roxanne was involved in an extortion attempt, were you telling the truth then?

A. That's when I thought that?

Q. Yes.

A. Yes.

Q. Okay, yes?

A. Yes.

Q. Yes, you were telling the truth then?

A. As far as—you know.

Q. Don't let me put words in your mouth. You tell me.

A. To that degree when I was talking, yes, I thought I was telling the truth.

Q. And that is the point, that is the point at which you figured out that there was an extortion attempt, is that correct, after the phone calls?

A. Basically.

Q. Yes or no?

A. Yes.

Q. Okay. So what you told the FBI was true?

A. Yes.

*Id.* at 47–48.

Following that exchange, Vasile denied that Grewal had told him in early November of 1996 that she was going to blackmail Gill. *Id.* at 48–49. That fact had been clearly set forth in the PSI and had not been contested by Vasile. *See* Vasile PSI at ¶ 17. When pressed on this contradiction, Vasile again changed his position, this time to "I don't remember." Tr. at 49; *see id.* at 50. Vasile's confusion persisted:

Q. And you told [the government during your proffer meeting] that in early November 1996 you saw Grewal at a

diner, that she told you she had information on Gill, she was going to blackmail him?

A. She may have, yes.

Q. Did you tell them that in your meeting?

A. I probably did.

Q. You did or you didn't?

A. I did.

Q. Okay. You did, you definitely told them that in your meeting?

A. Yeah.

*Id.* at 51. Vasile summarized that he told the truth at his proffer meeting with the government when he stated that Grewal had informed him of the blackmail plan in a diner, and that he told the truth at the time of his arrest when he told the FBI that he had no knowledge of the extortion plan until after the telephone calls. *Id.* at 52.

I have considered Vasile's testimony and weighed it in the context of all the evidence presented. I conclude that Vasile said whatever he thought would best help him at the time he said it, regardless of the truth of his statements. During his post-arrest statements to the FBI where he sought to minimize his own guilt, Vasile said that he did not realize the extortionate nature of this plan until after the telephone calls. During his proffer meeting where he sought to help the government prosecute Grewal in exchange for a § 5K1.1 motion, Vasile said that Grewal admitted her extortionate plans to him before the telephone calls. Given Vasile's extensive experience in law enforcement, it is clear that Vasile was well-aware of the extortionate nature of the scheme. Therefore, I find that Vasile was aware of his involvement in an extortion plot prior to the telephone calls to Gill. Consequently, I also find that Vasile lied to the FBI at the time of his arrest and that Vasile lied under oath during the sentencing hearing in this case.

### G. A Plea of Ignorance

In addition to the specific instances of untruthfulness recounted above, Vasile's general characterization of his role in this scheme is, to say the least, incredible. For

example, Vasile agreed that even though he "was really tired that night" and "wanted to go home and go to bed," "instead of going home and going to bed … you decide[d] to go to Cherry Hill with Roxanne, a woman that you kind of just know from the diner who's been bugging you at home about something you don't want to help her with." Tr. at 73. Moreover, the former detective drove Grewal 20 miles each way because she wanted to see somebody. Grewal left him for 15 minutes, then returned and they left the diner. Despite his curiosity Vasile never asked her a single question about what she was doing, who she was seeing, or why. *Id.* at 74–77. I find Vasile's denials of his extensive involvement in this scheme to be absolutely incredible.

## III. GREWAL'S SENTENCE

### A. Guideline Calculations

Grewal's base offense level is 18. *See* U.S.S.G. § 2B3.2(a); *see also* Grewal Plea Agr., Sch. A at ¶ 1; Grewal PSI at ¶ 30. Although the offense appears to have involved an implied threat of bodily injury, *see* Tr. at 40, I will accept the parties' stipulation that such a threat was not the gravamen of the extortionate scheme and was later withdrawn. *See* Grewal Plea Agr., Sch. A at ¶ 2. Therefore, Grewal's offense level will not be increased by 2 levels for a threat of bodily injury. ·*See* U.S.S.G. § 2B3.2(b)(1). Because Grewal demanded payment of more than $50,000 from Gill, *see* Grewal Plea Agr., Sch. A at ¶ 3; Ex. V–2, however, her offense level will be increased by 2 levels to 20. *See* U.S.S.G. §§ 2B3.2(b)(2), 2B3.1(b)(7)(C).

The government stipulated that Grewal deserved a 3 level decrease in her offense level based on her acceptance of responsibility under U.S.S.G. § 3E1.1. *See* Grewal Plea Agr., Sch. A at ¶ 5; *see also* Grewal PSI at ¶¶ 36–37. With that reduction, Grewal's offense level would be 17. *See* Grewal PSI at ¶ 40.

Having zero criminal history points, Grewal falls into criminal history category I. *See id.* at ¶ 43. Thus, even with a 3 level adjustment for acceptance of responsibility, Grewal's guideline range would be 24–30 months. *See* U.S.S.G. § 5A. Given the maximum sentence allowed by statute, *see* 18 U.S.C. § 876, however, Grewal can be sentenced to no more than 24 months. *See* U.S.S.G. § 5G1.1(a). Therefore, because of the intersection between the 2 year statutory maximum term of imprisonment and the 24 month guideline minimum, I need not decide whether Grewal is entitled to a reduction in her offense level for acceptance of responsibility. *See United States v. Saccoccia,* 58 F.3d 754, 790–91 (1st Cir.1995) (finding no need to address whether defendant's total offense level was 43 or 45 where either would result in the imposition of the maximum sentence), *cert. denied,* 517 U.S. 1105, 116 S.Ct. 1322, 134 L.Ed.2d 474 (1996).

### B. Grewal's Downward Departure Motion

■ Grewal urges the Court to depart downward from her sentencing range because she allegedly committed this crime to bring Singh to justice. The Sentencing Guidelines recognize that "[s]ometimes, a defendant may commit a crime in order to avoid a perceived greater harm. In such instances, a reduced sentence may be appropriate, provided that the circumstances significantly diminish society's interest in punishing the conduct, for example, in the case of a mercy killing." U.S.S.G. § 5K2.11.[4]

· ■ Grewal contends that her conduct was merely designed to avoid what she perceived to be the injustice of allowing Gill to avoid prosecution. Grewal bears the burden of justifying a departure by a preponderance of the evidence. *See United States v. McDowell,* 888 F.2d 285, 291 (3d Cir.1989). Based

---

**4.** This section also permits a departure where "conduct may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue." U.S.S.G. § 5K2.11. That provision, to the extent it establishes a separate basis for departure, is not at issue here. *See United States v. Clark,* 128 F.3d 122, 124 (2d Cir.1997) (treating the two paragraphs of § 5K2.11 as somewhat distinct grounds for departure). Thus, Grewal's citation of *United*

*States v. Bernal,* 90 F.3d 465 (11th Cir.1996), is inapposite. *See id.* at 467 (affirming departure because the defendants' conduct "did not 'cause or threaten .the harm or evil sought to be prevented by the law proscribing the offense at issue' "). Moreover, all of the cases cited by Grewal depend upon unique factual circumstances, such as the defendant's sincerely held belief, which I find to be absent in this case.

upon Grewal's testimony, I do not credit Grewal's professed motives. *But see* Letter from Kenneth J. Weiss, M.D., F.A.P.A., to Anne E. Blanchard, Esq. (dated July 28, 1997) at 4 ("My evaluation of Ms. Grewal is that she sincerely believed she was doing right."). I have determined that Grewal intended to deposit Gill's payment, by way of cashier's check, in her daughter's boyfriend's bank account. *See supra* Part II.C. This is inconsistent with Grewal's professed intent to turn over any payments to the police "immediately" as evidence of Gill's guilt. *See* Tr. at 316. In addition, Grewal is a far cry from a credible witness. *See supra* Parts II.A to II.C. I conclude that Grewal's true motive in this extortionate plot was financial gain, and not to bring Gill to justice.[5]

█ Moreover, a departure under § 5K2.11 is typically inappropriate where the defendant could have pursued other means of avoiding the greater harm rather than committing a crime. *See United States v. Hunter,* 980 F.Supp. 1439, 1449 (M.D.Ala.1997) (rejecting defendant's contention that he sold drugs to earn money for his drug habit in order to avoid the perceived greater harm of withdrawal symptoms, largely because the defendant "could have sought treatment for his addiction at any time, rather than engage in conduct that he knew was illegal to support his addiction"); *United States v. Pierce,* 1997 WL 260454, *5 (N.D.Ill. May 7, 1997) (rejecting defendant's contention that he engaged in bank fraud to obtain money for a lawyer to defend his son against criminal charges because court-appointed counsel was available). Similarly, even if Grewal truly believed that Gill had murdered Singh, she could have sought assistance from the police. Grewal testified, however, that she never sought such help. Tr. at 159, 200. For these reasons, although recognizing my discretion to depart on this basis, Grewal's motion for a downward departure pursuant to § 5K2.11 will be denied.

█ Grewal cites U.S.S.G. § 5K2.0 as an alternative basis for a departure. That section provides that a district court may depart from the guidelines "if the court finds 'that

there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)); *see Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

That section, however, cannot provide a basis for departure where the grounds for the motion are adequately considered by another section of the Guidelines. *See* 18 U.S.C. § 3553(b); *United States v. Love,* 985 F.2d 732, 735–736 (3d Cir.1993) (finding that where § 5K1.1 contemplated a certain factor, that factor "is not a proper basis for a downward departure under § 5K2.0 and 18 U.S.C. § 3553(b), which allow departure for factors not adequately taken into consideration by the Commission in formulating the Guidelines"). The factor which Grewal relies upon, that she only committed this crime to bring Gill to justice, is adequately considered by § 5K2.11 which permits a departure where the defendant acts to avoid a greater harm. *Cf.* Tr. at 269 (counsel for Grewal characterized the basis for the departure motion as "[l]esser harms, the lesser harms"). Therefore, that factor does not provide a proper ground for departure under § 5K2.0. Even if this were an appropriate basis for departure under § 5K2.0, however, I would decline to exercise such discretion for the reasons which I cited in declining to, depart under § 5K2.11. Therefore, Grewal's motion for a downward departure will be denied.

### C. Obstruction of Justice

█ The statutory maximum penalty imposed by Grewal's offense of conviction, 18 U.S.C. § 876, limits her guideline range to a 2 year term of imprisonment. Accordingly, I may not depart upward from this statutory maximum. *See* U.S.S.G. § 5G1.1(a); *compare* 18 U.S.C. § 3553(e) (providing limited authority to depart below a statutory minimum sentence). Therefore, I need not address the issues of Grewal's admitted de-

---

5. Even if I found that she actually believed this story, however, the circumstances would not "diminish society's interest in punishing the con-

duct" to a level commensurate with a mercy killing. *See* U.S.S.G. § 5K2.11.

struction of evidence, *see* Tr. at 197–99, 316, or of her apparent perjury at the sentencing hearing, *see supra* Parts II.A to II.C.

### D. Restitution

 Under the Mandatory Victims Restitution Act of 1996 ("MVRA"), Pub.L. No. 104–321, 110 Stat. 1214, restitution is now mandatory in the full amount of any loss. *See, e.g.,* 18 U.S.C. §§ 3663A (1997), 3664(f)(1)(A) (1997). Although the MVRA purports to apply to all defendants convicted on or after April 24, 1996, *see* 18 U.S.C. § 2248 (statutory notes) (1997), application of the MVRA to Grewal's conduct would violate the Constitution's Ex Post Facto prohibition. *See United States v. Sclafani,* 996 F.Supp. 400, 404 (D.N.J.1998). Therefore, I will consider ordering Grewal to pay restitution under the law in effect at the time of her offense conduct. *See id.*

As part of her plea agreement with the government, Grewal stipulated that she would pay restitution. *See* Grewal Plea Agr., Sch. A at ¶ 4. I agree that the imposition of restitution is appropriate in this case. *See* 18 U.S.C. § 3664(a) (1986). The Third Circuit requires that I make specific factual findings regarding: (1) the amount of loss; (2) the defendant's ability to pay and the financial needs of the defendant and her dependents; and (3) the relationship between the restitution and the loss. *See United States v. Logar,* 975 F.2d 958, 961 (3d Cir.1992); *Sclafani,* 996 F.Supp. at 404. I will address these issues on the record at the time of sentencing.

### IV. VASILE'S SENTENCE

#### A. Guideline Calculation

Vasile's base offense level is 4. *See* U.S.S.G. §§ 2X1.1, 2B1.1; *see also* Vasile Plea Agr., Sch. A at ¶ 1; Vasile PSI at ¶ 30. That level will be increased by 2 because the offense involved more than minimal planning. *See* U.S.S.G. § 2B1.1(b)(4)(A); *see also* Vasile Plea Agr., Sch. A at ¶ 3; Vasile PSI at ¶ 32. I accept the parties' stipulation that, pursuant to U.S.S.G. § 2B1.1(b)(1)(H), Vasile's offense level will be increased by 7 levels because during Vasile's participation the offense involved a demand for only $50,-000. *See* Vasile Plea Agr., Sch. A at ¶ 2;

Vasile PSI at ¶ 31. Here, alas, my concurrence with Vasile's Plea Agreement and the PSI must end.

 Vasile and the government stipulated that he has demonstrated an affirmative acceptance of responsibility and that, therefore, pursuant to U.S.S.G. § 3E1.1, his offense level would be reduced by 2 levels. *See* Vasile Plea Agr., Sch. A at ¶ 5; *see also* Vasile PSI at ¶ 37. I have found, however, that Vasile lied to the FBI and to this Court while testifying under oath, and has continuously attempted to portray his role in this affair as minimal, despite clear evidence to the contrary. *See supra* Parts II.D to II.G. I can think of few less appropriate cases for a downward adjustment based on acceptance of responsibility. *See* U.S.S.G. § 3E1.1 app. note 1(a) (false denials are inconsistent with acceptance of responsibility); *United States v. Thompson,* 76 F.3d 442, 458 (2d Cir.1996) (affirming denial of § 3E1.1 adjustment where defendant had lied to probation officer); *United States v. Yanez,* 985 F.2d 371, 375 (7th Cir.1993) (affirming denial of § 3E1.1 adjustment where defendant was "untruthful" in his characterization of his role in certain telephone conversations); *United States v. Salmon,* 944 F.2d 1106, 1127 (3d Cir.1991) (affirming denial of § 3E1.1 adjustment where defendant attempted to minimize his role in his statement to the probation officer), *cert. denied,* 502 U.S. 1110, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992); *United States v. Ortiz,* 878 F.2d 125, 128 (3d Cir.1989) (same). Therefore, Vasile's offense level will not be reduced by 2 levels for an acceptance of responsibility.

I also reject the recommendation, made prior to the sentencing hearing, that Vasile receive a 2 level reduction in his offense level for his minimal role in the offense. *See* Vasile PSI at ¶ 34. Pursuant to Vasile's pre-hearing protestations, the Probation Officer determined that Vasile "appears to have occupied a minor role in the offense relative to … Grewal." *Id.* Having listened to the testimony presented at the sentencing hearing, I have little difficulty concluding that Vasile played a much more significant role than he initially led the government to believe. *See, e.g., supra* Part II.D to II.G.

Therefore, Vasile will not receive a 2 level downward adjustment in his offense level for his role in the offense. Thus, Vasile's total offense level is 13 which, with a criminal history category of I, represents a guideline range of 12–18 months.

## B. The Government's Downward Departure Motion

■ The government has filed a motion pursuant to U.S.S.G. § 5K1.1 for a downward departure from Vasile's guideline range on the basis of Vasile's substantial assistance to the government. The Guidelines provide that, "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1. I reject the suggestion that Vasile has provided substantial assistance to the government which would justify such a departure. Even though the government has elected to ignore Vasile's breaches of his promises to be candid and cooperative, and of the sanctity of his oath, the Court need not reward Vasile's self-serving conduct in the guise of assisting the government.

■ The fact that the government has filed a § 5K1.1 motion requesting a downward departure does not entitle Vasile to such a departure. *See United States v. Casiano*, 113 F.3d 420, 429 (3rd Cir.) (citing *United States v. Spiropoulos*, 976 F.2d 155, 162–63 (3d Cir.1992)), *cert. denied*, —— U.S. ——, 118 S.Ct. 221, 139 L.Ed.2d 155 (1997); *United States v. Bissell*, 954 F.Supp. 841, 899 (D.N.J.1996), *aff'd mem.*, 142 F.3d 429 (3d Cir.1998); *United States v. Juliano*, 947 F.Supp. 777, 789 (D.N.J.1996). A motion by the government is a necessary, but not a sufficient, condition of a § 5K1.1 departure. *See Casiano*, 113 F.3d at 429. Thus, the Third Circuit, like many other circuits, "has held that it is the district court's decision, not the prosecutor's, whether to depart and to what extent." *Id.*

Consequently, I have "broad discretion" in this decision. *See id.* ("A district court's discretion not to depart in the face of a motion under § 5K1.1 should be as broad as its discretion not to depart under § 5K2.0."). "In determining ... whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4 (citing 18 U.S.C. § 3661); *see United States v. Morris*, 139 F.3d 582, 584 (8th Cir.1998) (finding that denial of § 5K1.1 motion is not reviewable where sentencing court relied upon factors permitted by § 1B1.4). In this case, Vasile did not provide truthful, complete or reliable information to the government. *See* U.S.S.G. § 5K1.1(a)(2). Instead, Vasile repeatedly attempted to manipulate the government by providing contradictory accounts of these events and his role in them. Moreover, his testimony at the sentencing hearing was incredible, self-serving and deceitful. *See supra* Parts II.D to II.G.

I recognize that ordinarily "[s]ubstantial weight should be given to the government's evaluation of the extent of the defendant's assistance, particularly where the extent and value of the assistance are difficult to ascertain." U.S.S.G. § 5K1.1 app. note 3. In this case, however, even the government itself has characterized "Vasile's *weak* admissions and testimony as his attempt to minimize in his own mind his otherwise stupid choices." Government's Letter to the Court (dated March 17, 1998) at 2 (emphasis in original). The government's letter brief concluded:

> With regard to Vasile, the United States cannot point to any one particular lie or gross fabrication on his behalf. Clearly, this defendant's recollection should be substantially better than he claims it to be, especially given he [sic] training.

*Id.* at 6.

Inexplicably, the government makes these statements in support of its motion seeking a downward departure for Vasile. Although I do not pretend to understand why the government elected not to withdraw its motion for a downward departure after the sentencing hearing, I conclude that this case is a perfect illustration of why district courts have discretion to deny a § 5K1.1 motion. Under these circumstances, I do not hesitate to deny the government's motion. In light of Vasile's self-serving and deceitful testimony at the sentencing hearing, to grant the gov-

ernment's motion for a downward departure in this case would be a travesty of justice.

### C. Obstruction of Justice

 It is clear to me that I may depart upward from Vasile's applicable guidelines range on the basis of his thinly veiled lies. *See* U.S.S.G. § 3C1.1 app. notes 3(b), 3(f), 3(g), 3(h); *United States v. Dunnigan,* 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993); *United States v. Fiorelli,* 133 F.3d 218 (3d Cir.1998). I am satisfied, however, that Vasile's guideline range of 12–18 months, and the denial of the government's motion for a downward departure, will adequately punish Vasile for his conduct in this case. Therefore, I will not depart upward in this instance.

### D. Restitution

Vasile has agreed to "make restitution to the victim of this offense in an amount to be determined prior to sentencing." Vasile Plea Agr., Sch. A at ¶ 4. At the time of sentencing, I will make the required findings and impose an appropriate order of restitution. *See supra* Part III.D; *see generally United States v. Sclafani,* 996 F.Supp. 400 (D.N.J. 1998).

### V. CONCLUSION

For the reasons set forth above, Grewal's motion for a downward departure will be denied and the government's motion for a downward departure on Vasile's behalf will also be denied.