**UNITED STATES of America,**

v.

**Edward Andrew ROONEY, Defendant.**

No. CR–04–55–B–W.

United States District Court,
D. Maine.

Jan. 11, 2005.

Theodore Griswold Fletcher, Fenton, Chapman & Kane, Bar Harbor, ME, for Edward Andrew Rooney (1), Defendant.

James L. McCarthy, Office of the U.S. Attorney, District of Maine, Bangor, ME, for USA, Plaintiff.

## PRESENTENCE ORDER

WOODCOCK, District Judge.

Having pleaded guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), Edward A. Rooney moves this Court to depart downward from the guideline range of sentence pursuant to U.S.S.G. § 5K2.11, Lesser Harms, and U.S.S.G. § 5K2.12, Coercion and Duress. Mr. Rooney contends he possessed the firearms because he and his family were under a credible threat of substantial bodily harm, even death, from Mrs. Rooney's ex-boyfriend and his possession of firearms was a direct response to this threat. After an evidentiary hearing on November 1, 2004 and the submission of memoranda, this Court denies the Defendant's motion for downward departure on the ground that he has failed to sustain his burden of proof.

## I. PROCEDURAL BACKGROUND

On July 14, 2004, a federal grand jury charged Edward A. Rooney in a one count indictment with Possession of a Firearm by a Felon, a violation of 18 U.S.C. § 922(g)(1). On August 13, 2004, Mr. Rooney pleaded guilty to the charge. A Presentence Investigation Report was completed on October 1, 2004 and, after granting a three level reduction for acceptance of responsibility, it calculated a total offense level of 17. The criminal history category was a Category III, establishing a guideline range of sentence of 30 to 37 months, a period of supervised release of between 2 to 3 years, a fine between $5,000.00 and $50,000.00, and a $100.00 special assessment. Mr. Rooney objected to the Report on the ground that "extraordinary circumstances" led him to purchase and possess the firearms. At a Presentence Conference on October 13, 2004, Mr. Rooney stated his intention to move for a downward departure from the guideline range of sentence, based on U.S.S.G. §§ 5K2.11 and 5K2.12. He requested an evidentiary hearing to establish the facts underlying the motion. The Court held an evidentiary hearing on November 1, 2004. Mr. Rooney filed a memorandum in support of the motion on November 24, 2004; the Government filed its opposing memorandum on December 2, 2004.

## II. STATEMENT OF FACTS

### A. The Offense: April 28, 2004.[1]

About 10:30 p.m. on April 28, 2004, the Hancock County Regional Communication Center (RCC) received a 911 call from the residence of Mr. and Mrs. Edward Rooney of Bucksport, Maine. The call was interrupted and the RCC contacted the Bucksport Police Department to investigate. Officers Ryan Knight and Matthew Cyr proceeded to the Rooney residence and were greeted at the door by Mr. Rooney, who denied that there were any problems at the home or that anyone had called 911. The officers could see, however, Shirley Rooney in the background and observed she was holding a tissue to a cut on her lip and had red marks on her throat. When the officers attempted to question Mrs. Rooney, Mr. Rooney responded instead, asserting she had assaulted him, striking him in the face. The officers directed their questions solely to Mrs. Rooney.

---

1. This portion of the Statement of Facts has been gleaned from the Prosecution Version, which Mr. Rooney admitted during the August 13, 2004 Rule 11 hearing, the Presentence Report, and the evidence admitted during the testimonial hearing on November 1, 2004.

She told a different story.[2] She said Mr. Rooney had been drinking most of the evening and when she asked him to change the TV channel, he became irate and assaultive, pulled her by the hair, grabbed her by the throat, and punched her in the face. When she tried to call 911, she said he ripped the phone out of the wall. She said when she got the car keys to leave, he grabbed her again by the hair, choked her, and threw her to the floor. She related to the police that when she told him he could get in trouble for this, he replied: "I'll kill you, bitch."

She told the police she was afraid of him, because he had guns in the house, and that Mr. Rooney was a convicted felon and was not supposed to have firearms. She showed the officers the following firearms and ammunition in their bedroom closet: 1) a Cobray PM–11, 9mm semi-automatic handgun with a small magazine, three large magazines, and 146 rounds of 9mm ammunition; and, 2) a Yugo Model 59/66, 7.62 × 39mm rifle and 140 rounds of ammunition. Mr. Rooney was arrested and the weapons and ammunition were seized. Upon investigation, it was determined that Mr. Rooney had purchased the Yugo rifle on April 8, 2004 and the Cobray handgun on April 11, 2004 and that he later purchased ammunition for both firearms. Mr. Rooney is a convicted felon: on October 24, 2002, he was convicted of Burglary, Class C, in violation of 17–A M.R.S.A. § 401, in Penobscot County Superior Court Docket No. CR 2000–201, and was sentenced to eighteen months imprisonment, all but sixty days suspended and two years probation.

### B. The November 1, 2004 Hearing.

Mr. Rooney called the following witnesses at the November 1, 2004 hearing: 1) Dr. Kim Tousignant, a clinical psychologist,[3] 2) Ruth Quirino, a former United States Probation Officer; 3) Donn Stauffer, a Maine State Probation Officer; and, 4) Mr. Rooney. The Government called two witnesses: 1) Candice Kiefer, a Maine State Probation Officer; and, 2) Robert Jordan, a Detective with the Penobscot County Sheriff's Office.

### C. Jerrad Roberts.

Jerrad Roberts, Mrs. Rooney's ex-boyfriend, is the focus of Mr. Rooney's motion. Mr. Rooney contends that Mr. Roberts is a violent and dangerous man, whose persistent threats against Mrs. Rooney and others justified Mr. Rooney's possession of a gun. Mr. Roberts is a convicted felon with an extensive criminal history.[4] Although the exact dates are not clear from the record, he has apparently been incarcerated at least since March 30, 2000, when he was convicted of assault on an officer,

---

**2.** At the Rule 11, Mr. Rooney admitted what his wife said, but not the truth of what she said. (Docket No. 11).

**3.** Dr. Tousignant is Mrs. Rooney's clinical psychologist. She testified pursuant to a release signed by Mrs. Rooney and giving her permission to reveal otherwise confidential information.

**4.** Mr. Rooney introduced certified copies of Mr. Roberts' convictions. On April 3, 1995, Mr. Roberts was convicted of one count of Burglary, Class A; one count of Robbery Class A; three counts of Burglary, Class C;

and twelve counts of Burglary, Class B. The net effect of the sentencing was sixteen years imprisonment to be served concurrently, all but five years suspended, and six years probation. *Defendant's Exhibit 2.* On January 29, 1999, he was convicted of assault and violation of a condition of probation and was sentenced to three hundred and sixty-four days imprisonment, all but thirty days suspended. *Id.* On March 30, 2000, he was convicted of assault on an officer, operating under the influence, and failure to stop. He was sentenced to two and one-half years imprisonment. *Id.*

OUI, and failure to stop. As of November 1, 2004, Mr. Roberts remained in state custody.

Mr. Rooney presented substantial evidence that Mr. Roberts is potentially dangerous. In 1999, Mr. Roberts was convicted of assaulting Mrs. Rooney.[5] Further, Mr. Rooney introduced through Dr. Tousignant numerous vulgar and threatening letters Mrs. Rooney received from Mr. Roberts, beginning September 28, 2000 and continuing through January 2, 2002. She testified Mr. Roberts continued to write letters to Mrs. Rooney until January 2004, when Dr. Tousignant understood he was going to be released from prison. Dr. Tousignant confirmed the content of these letters scared Mrs. Rooney. She testified that Mrs. Rooney had been in an abusive relationship with Mr. Roberts and Mrs. Rooney was extremely concerned he would harm her and members of her family upon his release from prison. Mr. Rooney also presented testimony from two of Mr. Roberts' probation officers that confirmed generally his violent propensities.

### D. Edward Rooney's Testimony.

Mr. Rooney testified he married Shirley Rooney on January 6, 2003, after they had lived together for a period of time. Although he knew of Mrs. Rooney's prior relationship with Mr. Roberts, he became aware in the fall and early winter of 2002 that Mr. Roberts was threatening her. Mr. Rooney's initial reaction was that "the guy's kind of crazy, and that's pretty much it." However, in December 2003, Mrs. Rooney told him she learned from Dr. Tousignant that Mr. Roberts was sched-

uled to be released from prison in January 2004. To avoid Mr. Roberts, Mr. and Mrs. Rooney moved to Rhode Island to live with Mr. Rooney's father.[6] After about six or seven weeks, the Rooneys left Rhode Island and returned to Maine.

Shortly after their return to Maine in early March 2004, Mr. Rooney learned Mr. Roberts' family had hired some lawyers and he would likely be released under an early release program. Mrs. Rooney, who was pregnant, became extremely nervous about Mr. Roberts. She kept the shades drawn, slept with a baseball bat beside her bed, and was restless at night. It was about that time Mr. Rooney became aware of the "severity of abuse" his wife had endured at the hands of Mr. Roberts.

They discussed what to do. She rejected any notion of going to the police. She had gone twice previously and each time when Mr. Roberts found out, he had beaten her. They considered moving, but were restricted due to the fact they were in Section 8 housing. Mr. Rooney urged Mrs. Rooney to move to Massachusetts or Rhode Island, but she did not want to leave her son in Maine. Mr. Rooney tried to convince her to get a protection from abuse order and to dye her hair. He did buy her a bottle of Mace. It was then they decided, according to Mr. Rooney, to purchase some firearms to protect themselves from Mr. Roberts.

### III. Discussion.

### A. Lesser Harms: § 5K2.11.

Mr. Rooney argues his purchase and possession of firearms were justified under

---

5. Mr. Rooney introduced a photograph of Mrs. Rooney that confirms the physical nature of the assault.

6. This is Mr. Rooney's version of why they left for Rhode Island. Candice Kiefer, his state probation officer, testified she understood the reason he had left Maine to go to Rhode

Island was that he was having problems with his relationship with Mrs. Rooney and wanted to return home to Rhode Island. Mr. Rooney acknowledged he had not told Ms. Kiefer about Mr. Roberts' threats. He explained that he and Ms. Kiefer "didn't have exactly a friendly relationship."

U.S.S.G. § 5K2.11.[7] Because he genuinely perceived a greater harm in the injury or possibly death of his pregnant wife, he asserts he elected the lesser harm by purchasing weapons to protect her and their family.

### 1. The Prongs.

█ The first question is whether this Court has the authority to depart downward. Section 5K2.11 contains a "two-pronged test." *See United States v. Rojas*, 47 F.3d 1078, 1080 (11th Cir.1995). Under the first prong, the court can depart if Mr. Rooney's criminal conduct avoided a perceived greater harm. *See United States v. Carvell*, 74 F.3d 8, 9 (1st Cir.1996); *United States v. Powell*, 50 F.3d 94, 105 (1st Cir.1995). Under the second prong, the court can depart if the defendant's conduct may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue. *Rojas*, 47 F.3d at 1080; *United States v. Hadaway*, 998 F.2d 917, 920 (11th Cir. 1993). Mr. Rooney's argument is restricted to the first prong.

### 2. The Second Prong: Conduct Not Caused or Threatened the Harm to be Prevented.

Very few cases address § 5K2.11's "perceived greater harms" prong in the context of a felon in possession. In felon in possession cases, § 5K2.11 more commonly arises under the second prong. *See Unit-*

ed States v. Lewis*, 249 F.3d 793, 796 (8th Cir.2001) (Defendant's brief possession of firearm to pawn the weapon to pay bills and attempt to retain family heirloom justified under second prong); *United States v. White Buffalo*, 10 F.3d 575, 577 (8th Cir.1993) (Defendant's possession of .22 rifle to shoot skunks, weasels, and raccoons that were killing his chickens justified under second prong); and, *United States v. VanLeer*, 270 F.Supp.2d 1318, 1326–27 (D.Utah 2003) (Defendant's brief possession to dispossess the firearm justified under second prong); *but see United States v. Warner*, 43 F.3d 1335 (10th Cir.1994).

### 3. The First Prong: Greater Harms.

There are a few examples of downward departures under the "greater harms" prong of § 5K2.11. *See United States v. Carvell*, 74 F.3d 8, 12 (1st Cir.1996) (departure upheld where defendant engaged in marijuana manufacturing as alternative to suicide); *United States v. Barajas–Nunez*, 91 F.3d 826 (6th Cir.1996) (Defendant's illegal entry into United States justified by his perception that his pregnant girlfriend was gravely ill and in need of medical care); *United States v. Nava–Sotelo*, 232 F.Supp.2d 1269 (D.N.M.2002), *rev'd on other grounds*, 354 F.3d 1202 (10th Cir.2003), *cert. denied*, 541 U.S. 1035, 124 S.Ct. 2112, 158 L.Ed.2d 720 (2004) (Defendant's involvement in brother's at-

---

7. U.S.S.G. § 5K2.11—Lesser Harms provides in relevant part:

Sometimes, a defendant may commit a crime in order to avoid a perceived greater harm. In such instances, a reduced sentence may be appropriate, provided that the circumstances significantly diminish society's interest in punishing the conduct, for example, in the case of a mercy killing. Where the interest in punishment or deterrence is not reduced, a reduction in sentence is not warranted. For example, providing defense secrets to a hostile power should receive no lesser punishment simply because the defendant believed that the government's policies were wrong. In other instances, conduct may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue. For example, where a war veteran possessed a machine gun or grenade as a trophy, or a school teacher possessed a controlled substance for display in a drug education program, a reduced sentence might be warranted.

tempted escape from prison justified under "perceived greater harm" prong).

However, a downward departure under § 5K2.11's "greater harms" prong applies only in "narrow, extreme circumstances, such as mercy killing." *United States v. Barajas–Nunez*, 91 F.3d at 832. Further, a departure under this prong of § 5K1.11 "is typically inappropriate where the defendant could have pursued other means of avoiding the greater harm rather than committing a crime." *United States v. Grewal*, 2 F.Supp.2d 612, 624 (D.N.J. 1998). *See also United States v. Hunter*, 980 F.Supp. 1439, 1449 (M.D.Ala.1997). In *United States v. Murray*, 89 F.3d 459 (7th Cir.1996), the Seventh Circuit rejected an argument that a defendant's possession of a firearm in an automobile around midnight with crack cocaine in his car entitled him to a § 5K2.11 downward departure. The Seventh Circuit noted: "If Murray, a convicted felon, kept a firearm in his house on a particular day because of a direct, imminent threat of harm from an anticipated intruder, he might conceivably find comfort under § 5K2.11." *Id.* at 463.

### 4. The Interest of Society.

Section 5K2.11 contemplates the court will analyze the interest of society in punishing Mr. Rooney's possession of the firearms against the perception of a greater harm. Congress enacted federal gun control legislation to "curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'" *Huddleston v. United States*, 415 U.S. 814, 824, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974) (quoting S.Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968)). In *Huddleston*, the Supreme Court noted that Congress was concerned with possession of firearms by individuals "whose possession of weapons would be contrary to the public interest." *Id.* at 828, 94 S.Ct. 1262; *Unit-*ed States v. Gillies*, 851 F.2d 492, 494 (1st Cir.1988), *cert. denied*, 488 U.S. 857, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988) ("Congress wished...to achieve a crime-control objective, namely, stopping convicted felons from possessing guns."). Further, a conviction under § 922(g) "focuses not on the defendant's reason for possessing a firearm, but on his status that bars him from possessing a firearm or ammunition." *United States v. Crawley*, 213 F.Supp.2d 1250, 1261 (D.Kan.2002).

The circumstances of Mr. Rooney's possession of firearms were particularly egregious. First, as of April 2004, Mr. Rooney was not only a convicted felon; he was also on state probation, which also prohibited his possession of firearms. Second, unlike *White Buffalo*, where the Defendant possessed a .22 rifle for shooting small varmints, Mr. Rooney purchased two serious firearms, a Cobray 9mm semi-automatic handgun and a Yugo, 39mm rifle, and an abundance of ammunition: 146 rounds for the Cobray and 140 rounds for the Yugo. Third, when the police arrived, Mr. Rooney had been "drinking all evening" according to Mrs. Rooney.

Fourth and most significantly, the police had been called to Mr. Rooney's home as a result of a domestic disturbance. During his Rule 11, Mr. Rooney admitted that when the police arrived at his residence, they could see his wife's cut lip and marks on her neck. (Docket No. 11). He also acknowledged she told the police he had pulled her by the hair, grabbed her by the throat, punched her in the face, and threatened to kill her. When she tried to call for help, he ripped the phone off the wall. Finally, it was his wife, who led the police to the firearms, because she said she was afraid of him. Congress has made it abundantly clear it does not want firearms in the hands of individuals who abuse their spouses. 18 U.S.C. § 922(g)(9). Although

there is no evidence Mr. Rooney had previously been convicted of the crime of domestic violence or that he has been convicted of domestic violence for the events of April 28, 2004,[8] in light of his admissions at the Rule 11, this Court concludes his possession of these weapons in the circumstances of the evening of April 28, 2004 was manifestly contrary to public policy.

### 5. The Defendant's Justification.

Mr. Rooney's claimed justification does not withstand analysis. First, there is no evidence that whatever threat Mr. Roberts posed was direct and imminent. *See Murray*, 89 F.3d at 463. Mr. Roberts had been writing these troubling and vile letters to Mrs. Rooney for years. He was still in prison in early April 2004, when Mr. Rooney purchased the firearms; on April 28, 2004, when he was arrested; and, he was still in jail on November 1, 2004, when the evidentiary hearing on this motion was held.

It is true the Rooneys had been led to believe at various times that Mr. Roberts was going to be released. Dr. Tousignant initially told Mrs. Rooney that Mr. Roberts was going to be released on January 8, 2004 and later she told her he was going to be released in April 2004, neither of which turned out to be accurate.[9] As of April 2004, Mr. Rooney had heard only that Mr. Roberts "might be getting out soon." But, before Mr. Rooney can justify his decision to illegally purchase and possess firearms, he should have at least confirmed Mr. Roberts's status. If he had done so, he would have learned Mr. Roberts was still in state custody and he was not justified in purchasing and possessing firearms in April 2004.[10]

■ Third, to avail himself of § 5K2.11, Mr. Rooney must demonstrate he could not have pursued other means of avoiding the commission of a crime. *See Grewal*, 2 F.Supp.2d at 624. Mr. Rooney testified they moved to Rhode Island in January to avoid Mr. Roberts and he obtained his probation officer's approval of the move. But, they returned to Maine in March. He did not alert the police or other law enforcement of Mr. Roberts' threats and there is no evidence Mrs. Rooney did so. He did not alert his probation officer. There is no indication in the record that Mr. Roberts' disturbing and potentially violent letters were ever brought to the attention of authorities.

Fourth, although Mr. Rooney professed the reason he obtained the firearms was to protect Mrs. Rooney, he admitted, even though she was unfamiliar with firearms, he never taught her to load or fire the weapons. If Mr. Roberts had come when Mr. Rooney was not home, there is no evidence she would have been able to use the firearms to protect herself.

Fifth, Mr. Rooney's emotional testimony about his desire to protect Mrs. Rooney from Mr. Roberts' abuse rings hollow in the circumstances of this case, where the police responded to his home on a domes-

---

8. Candice Kiefer, Mr. Rooney's state probation officer, testified that Mr. Rooney has been charged at the state level with violating his probation for the events of April 28, 2004. That charge is still pending.

9. Dr. Tousignant obtained her information about Mr. Roberts' release dates from his probation officer. She acknowledged in her testimony that the "dates keep changing pretty unpredictably."

10. There is no evidence Mr. Rooney sought to clarify Mr. Robert's incarceration status before he purchased these firearms. He had only heard "from Dr. Kim" that Mr. Roberts was going to be released some time in March, 2004, but this turned out to be incorrect. His decision to purchase and possess firearms does not seem to have been prompted by any new information that Mr. Roberts' release was imminent.

tic disturbance call during which his wife claimed he had assaulted and threatened to kill her. After all, it was Mrs. Rooney, the object of Mr. Rooney's protection, who told the police about his firearms, led them to the upstairs bedroom closet where they were stored, and told them she was "scared for herself and the children" not about Mr. Roberts, but about Mr. Rooney.

### 6. Conclusion: § 5K2.11—Greater Harm.

This Court concludes that Mr. Rooney failed to sustain his burden to demonstrate he is entitled to a § 5K2.11 "greater harm" downward departure. Mr. Rooney's possession of firearms was contrary to society's interest as clearly expressed in federal firearms legislation and he has not demonstrated his possession of the firearms was justified.

### B. Section 5K2.12—Coercion and Duress.

■ Mr. Rooney next argues his possession of firearms was justified under § 5K2.12.[11] This argument is similar to the greater harm argument: because Mr. Rooney genuinely believed he was under duress from Mr. Roberts, he contends he was justified in purchasing and possessing firearms to protect his wife and their family.

### 1. The Law.

■ Mr. Rooney bears the burden of persuading the court that he is eligible for a § 5K2.12 downward departure. *United States v. Sachdev*, 279 F.3d 25, 28 (1st Cir.2002); *United States v. Rizzo*, 121 F.3d 794, 801 (1st Cir.1997). A defense of duress may play "two roles in a criminal case." *Sachdev*, 279 F.3d at 28. It may be presented at trial in avoidance of criminal liability or at sentencing to permit a downward departure under the Guidelines. *Id.* The "type and kind of evidence necessary to support a downward departure premised on duress is somewhat less than that necessary to support a defense of duress at trial." *United States v. Amparo*, 961 F.2d 288, 292 (1st Cir.1992). Mere duress is "insufficient"; the duress must be "serious" in the language of the Guideline. *Sachdev*, 279 F.3d at 28; *United States v. Rivera*, 994 F.2d 942, 949 (1st Cir.1993). The threat must ordinarily be a threat of physical injury, if coercion is invoked as a basis for a downward departure. *Sachdev*, 279 F.3d at 29. If the conditions are met, however, a departure under § 2K2.12 is "encouraged." *Id.* at 28.

■ Although § 5K2.12 provides the circumstances should be evaluated "as the defendant believes them to be," the First Circuit has clarified that the standard is essentially an objective one. *Id.* at 29. The district court must "objectively determine whether a reasonable person in defendant's position would perceive there to be a threat, explicit or implicit, of physical

---

11. U.S.S.G. § 5K2.12—Coercion and Duress reads:

If the defendant committed the offense because of serious coercion, blackmail, or duress, under circumstances not amounting to a complete defense, the court may depart downward. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions, on the proportionality of the defendant's actions to the seriousness of coercion, blackmail, or duress involved, and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be. Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency. Notwithstanding this policy statement, personal financial difficulties and economic pressures upon a trade or business do not warrant a downward departure.

injury... resulting from the unlawful action of a third party..." *Id.* In making this determination, there are at least three questions to be considered: 1) the actual intent of the person alleged to have made the threat; 2) the subjective understanding of the defendant; and, 3) whether an objective third party could reasonably consider it to be a serious threat of physical injury. *Id.* As *Sachdev* stated, the "ultimate issue remains that of whether the defendant committed the offense 'because of' serious coercion, blackmail, or duress." *Id.* The First Circuit has also held that the focus of the coercive effect must be on the defendant himself. *Id.* at 29–30. Thus, in *United States v. Pozzy*, 902 F.2d 133 (1st Cir.1990), the First Circuit rejected the district court's determination that Mrs. Pozzy's husband had coerced and threatened her to participate in his cocaine business.

### 2. Discussion.

The facts in this case fall far short of the circumstances contemplated by a § 5K2.12 downward departure. Rooney cites *United States v. Cheape*, 889 F.2d 477, 480 (3rd Cir.1989) for the proposition that "the Commission did not require proof of immediacy or inability to escape" to be entitled to a downward departure under § 5K2.12. *See also United States v. Cotto*, 347 F.3d 441, 446 (2nd Cir.2003) ("although the affirmative defense of duress requires a well-founded fear of imminent bodily harm with no opportunity to escape, § 5K2.12 requires only a more general 'threat of physical injury' or 'substantial damage to property,' and thus reflects a broader conception of coercion than does the affirmative defense.") (citations omitted); *United States v. Henderson–Durand*, 985 F.2d 970, 976 (8th Cir.1993) ("This ground for departure is broader than the defense of duress, as it does not require immediacy of harm or inability to escape, and allows the district court to consider the subjective mental state and personal characteristics of the defendant in its determination."). Nevertheless, "the same logic that animates the defense also animates § 5K2.12." *Cotto*, 347 F.3d at 446; *United States v. Pinto*, 48 F.3d 384, 389 (9th Cir. 1995) (noting that "discussion of the elements of perfect duress [is] not irrelevant to the issue of imperfect duress" under § 5K2.12).

Applying the lesser standard for a duress downward departure, this Court must still be satisfied the defendant violated the law because of the duress. In this case, the immediacy and seriousness of the threat are intertwined. *See United States v. Anderson*, 139 F.3d 291, 300 (1st Cir. 1998) (downward departure denied because coercive effect of past physical violence was not present during relevant time period). A threat of serious injury from someone locked away in prison is objectively less serious than the same threat from someone turning in the driveway. *See generally United States v. Arthurs*, 73 F.3d 444, 448–49 (1st Cir.1996) (a "lingering threat of future harm" is insufficient for a duress defense). As Mr. Roberts was in prison and there is no evidence Mr. Rooney had confirmed his imminent release before purchasing these firearms, Mr. Rooney has failed to prove a causal connection between Mr. Roberts' threats and his purchase and possession of the firearms.

▆ Similarly, even under the less stringent standard for a duress downward departure, this Court also concludes there is an obligation on the defendant to demonstrate "no reasonable alternative to violating the law." *Sachdev*, 279 F.3d at 28. For the reasons discussed earlier, Mr. Rooney has failed to demonstrate he had no alternative to violating federal firearms law.

Third, Mr. Roberts' threats were directly almost exclusively against Mrs. Rooney, not against Mr. Rooney. Although a husband's instinct to protect his family from physical harm might well exceed his instinct to protect himself, this Court, in evaluating the objective reasonableness of his actions, considers as a significant factor Mrs. Rooney's perception of the threat Mr. Roberts posed. It was Mrs. Rooney herself who alerted the police to the firearms. The objective reasonableness of Mr. Rooney's actions falls short when measured by the yardstick of Mrs. Rooney's actions. As the primary object of Mr. Roberts' venom, if Mrs. Rooney did not believe Mr. Roberts' threats justified Mr. Rooney's possession of firearms, this Court is hard pressed to conclude Mr. Rooney's own belief was objectively reasonable.

### 3. Conclusion: 5K2.12—Coercion and Duress

Mr. Rooney has failed to sustain his burden to demonstrate he is entitled to a downward departure under § 5K2.12—Coercion and Duress. He has failed to demonstrate he purchased and possessed the firearms in April, 2003, because he was under duress to do so.

## IV. CONCLUSION

Mr. Rooney's motion for downward departure under U.S.S.G. §§ 5K2.11 and 5K2.12 is DENIED.

**SO ORDERED.**